NUMA CO., LTD. and SUBSIDIARIES (an Ohio corporation), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Numa Co. v. Commissioner
Docket No. 4856-78.
United States Tax Court
T.C. Memo 1981-63; 1981 Tax Ct. Memo LEXIS 682; 41 T.C.M. (CCH) 887; T.C.M. (RIA) 81063; February 18, 1981. *682 Thomas J. Scanlon and Jeffrey Terbeek, for the petitioner. John P. Graham, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined differences in petitioners' income tax of $ 18,540 for the taxable year ended June 30, 1972 and $ 16,481.34 for the taxable period ended February 28, 1973. After concessions by petitioners, the sole issue for decision is whether petitioners are entitled to an amortization deduction in respect of a covenant not to compete. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, with accompanying exhibits, is incorporated herein. Petitioners, Numa Co., Ltd., and subsidiaries, including Halbert's, Inc. (hereinafter collectively referred to as petitioner), are corporations incorporated under the laws of the State of Ohio, with their principal places of business in Akron, Ohio, at the time of the filing of the petition herein. Consolidated income tax returns were filed for each of the taxable periods involved with the Cincinnati Service Center, Cincinnati, Ohio. Halbert's, Inc. (hereinafter sometimes *683 the corporation) was organized under the laws of the State of Ohio on January 2, 1970. The original shareholders of Halbert's were Gary C. Halbert (Halbert) and Dennis B. Halinger (Haslinger). Halbert and Haslinger had originally formed a partnership, H & H Sales, in the late fall of 1968, for the purpose of developing a direct mail sales catalog. During 1969, Halbertdeveloped various ideas for the catalog, and the partnership determined to go into business selling genealogical and heraldic products by mail. The partners thereupon formed the corporation Halbert's, Inc., for the purpose of engaging in that business. Halbert and Haslinger each received 10 shares of the corporation's common stock, which constituted 50 percent of the corporation's issued and outstanding stock. Haslinger became president and treasurer of the corporation. Halbert became vice-president and secretary. The primary product developed by the corporation was the surname research report which was a one or two page account of the origin and history of a particular surname, accompanied by a reproduction of the earliest or the most prominent coat of arms (if any) associated with that name. The corporation *684 marketed its surname research reports in the following manner. First, it contracted with the Reuben H. Donnelley Corporation (Donnelley), which possessed a list of more than 70 million names of American motorists arranged by zip code (Donnelley list), to rearrange that list by alphabetical order of surnames. Then, it selected individual surnames and mailed solicitation letters to persons on the list with those surnames. The solicitation letter offered to sell the surname research report for the recipient's surname at a price which was originally set at $ 1 and later at $ 2. On the basis of response to the original (or follow-up) letters, the corporation compiled a new list of people who had purchased surname research reports, and that list was used to solicit orders for more expensive genealogical or heraldic products, particularly $ 20 plaques decorated with coats of arms. The lists of names of persons who had purchased surname research reports came to be known as the Nancy L. Halbert File (Halbert file). The Halbert file eventually grew to include approximately 6 million names; in the process of developing it, the corporation mailed approximately 140 million pieces of mail to *685 names on the original Donnelley list. As of October, 1971, the Halbert file was approximately 10 percent developed, and was the result of about 7 million solicitation letters mailed to names on the Donnelley list. Sales during the corporation's first full fiscal year, ended June 30, 1971, exceeded $ 3 million; net income in that year was $ 331,650 and retained earnings as of June 30, 1971, were $ 338,583, up from $ 6,933 as of July 1, 1970. Paid in capital reflected on Halbert's, Inc., balance sheet amounted to only $ 3,603. Sometime after June 30, 1972, and before October 6, 1972, the audit firm of Haskins & Sells succeeded J. K. Lasser and Co., which previously had done the auditing for the taxable year ended June 30, 1971. Haskins & Sells restated the income for Halbert's Inc., for the taxable year ended June 30, 1971, as $ 165,650, on management's recommendation, by setting up a reserve for income taxes otherwise due in the amount of $ 166,000, but not payable by reason of a net loss of a subsidiary, G.O.A., Inc., through its oil and gas well operations. The restated taxable income of Halbert's, Inc., from its operations before that loss of G.O.A., Inc., and before provisions *686 for income tax was $ 416,739 for its taxable year ended June 30, 1971. For the year ended June 30, 1972, the restated taxable income of Halbert's, Inc., from its operations before provision for a net loss of G.O.A., Inc., and before provision for income tax attributable to the covenant not to compete (here in issue) amounted to $ 903,667. [1] The restated balance sheet showed a stockholders equity in Halbert's, Inc., of $ 176,186 as of June 20, 1971, and $ 158,482 as of June 30, 1972, but the statement of assets and liabilities of Halbert's, Inc., attached to the consolidated return for the period ended June 30, 1972, showed such equity at $ 427,275 as of June 30, 1971, and $ 413,240 as of June 30, 1972. Shortly after the formation of Halbert's, Inc., in January, 1970, that corporation and its two shareholders (Halbert and Haslinger) entered into a stock purchase agreement dated February 1, 1970. Under the terms of the agreement, neither shareholder could sell any of his shares in the corporation without first offering to sell them to the corporation *687 at an agreed price per share; similarly, provisions were made for repurchase of a deceased shareholder's stock from his estate. The agreed repurchase price per share was to be set by collateral agreement, and revised periodically. By addendum to the agreement of February 1, 1970, the agreed valuation for each of the corporation's issued 20 shares was set at $ 20,000. The agreement did not contain a covenant not to compete. Halbert's Inc., in January, 1971, brought in William L. Miller (Miller), a corporate executive from another corporation, to be vice-president and general manager. On April 26, 1971, Halbert's, Inc., declared a stock dividend of 9 shares of its authorized and unissued stock for each share then outstanding so that Haslinger and Halbert each wound up with a total of 100 shares of the corporation's stock. On April 27, 1971, Halbert, Haslinger, and Miller entered into an agreement of sale whereby Halbert and Haslinger each sold Miller two shares of his stock in Halbert's, Inc., for $ 2,000 per share so that upon consummation of such sale to Miller the outstanding capital stock of the corporation was owned as follows: Shareholder
No. of Shares
Percent
Haslinger
98
49
Halbert
98
49
Miller
4
2
*688 The agreement of sale contained a waiver of the restrictions imposed by the stock purchase agreement, dated February 1, 1970, to which the corporation agreed. The price of $ 2,000 per share for such sale to Miller was set by adjusting the agreed valuation per share under the February 1970 stock purchase agreement adjusted for the 9 for 1 stock dividend. Also, on April 27, 1971, Halbert, Haslinger, Miller, and Halbert's, Inc., entered into a modification of the stock purchase agreement of February 1970, whereby Miller agreed to be bound by its terms. Again, there was no provision for a covenant not to compete. On June 21, 1971, the shareholders of the corporation (Halbert, Haslinger, and Miller) and the corporation entered into a Statement of Stock Valuation and Purchase Price, which placed a value of $4,500 per share on the 200 outstanding shares of the corporation's stock. Miller, by a letter dated June 22, 1971, to Halbert, offered to purchase all of Halbert's stock in the corporation for $ 750,000 cash, contingent upon arranging financing. Miller's offer did not contain or refer to any covenant not to compete by Halbert. The amount of his offer was the least amount *689 that Halbert would take for his stock ownership. The parties to the stock purchase agreement executed an appropriate waiver of its restrictions for the purposes of the prospective purchase and sale. Miller did not purchase Halbert's stock in the corporation because he was unable to obtain the financing, and the sales agreement, therefore, lapsed in accordance with its terms. On or about October 8, 1971, the shareholders and the corporation resolved inter alia to enter into a written agreement whereby the corporation would purchase all of the shares of the corporation's stock owned by Halbert. Said resolution was made and adopted in corporate minutes and, pursuant to such resolution, a written contract for the sale and purchase of Halbert's stock in the corporation was entered into by and between the corporation and Halbert on or about October 8, 1971. Concurrently with the execution and the delivery of the contract, Halbert, Haslinger, and Miller, as shareholders of the corporation, and the corporation executed a written consent to said stock sale by Halbert. The aforesaid resolution specifically provided in part -- that the Corporation purchase from Gary C. Halbert the *690 98 shares of without par value, common stock owned by him of the Corporation for the total purchase price of $ 750,000.00, the sum of $ 150,000.00 to be paid in cash and the balance by the issuance and delivery of the Corporation's Subordinated Debenture in the sum of $ 600,000.00, all as set forth in the certain Agreement between the Corporation, Gary C. Halbert and Nancy O. Halbert, a copy whereof being attached hereto and marked Exhibit "B" and hereby made a part hereof * * *. The pertinent provisions of the October 8, 1971, agreement were as follows: 1. Purchase and Sale of Gary's [Halbert's] Stock. Gary shall and does hereby sell, set over, transfer and assign unto the Corporation the ninety-eight (98) shares of without par value common stock of Halbert's, Inc., being all of the stock of Halbert's, Inc., owned by Gary, and the Corporation shall and does hereby purchase said ninety-eight (98) shares of Gary's Stock for a total purchase price of Seven Hundred Fifty Thousand Dollars ($ 750,000.00), said purchase price to be due and payable as hereinafter set forth. 2. Purchase Price. The Corporation shall pay to Gary the total purchase price in the sum of Seven *691 Hundred Fify Thousand Dollars ($ 750,000.00) in the following manner: (a) the sum of One Hundred Fifty Thousand Dollars ($ 150,000.00) shall be paid by the Corporation to Gary upon the execution of this Agreement, the receipt whereof being hereby acknowledged by Gary; and (b) the balance of the purchase price in the sum of Six Hundred Thousand Dollars ($ 600,000.00) shall be paid by the Corporation to Gary by the Corporation's execution and delivery to Gary of its Subordinated Debenture in the principal sum of Six Hundred Thousand Dollars ($ 600,000.00) bearing interest at the rate of seven percent (7%) per annum, said interest being due and payable quarterly and the principal being due in six (6) equal annual installments of One Hundred Thousand Dollars ($ 100,000.00) each, all in accordance with the terms and tenor of said Subordinated Debenture, a copy where of being attached hereto and marked Exhibit "A" and hereby made a part hereof. 6. Consultation. Within thirty (30) days of the date of the execution of this Agreement, the Corporation shall make available to the extent reasonably possible two (2) of its employees; namely, JOHN GARD and NORMANGOLD, so that they may consult *692 with Gary to review and develop the Corporation's marketing techniques and concepts. 7. Mailing Lists. Gary shall have the nonassignable right for a period of six (6) years commencing with the date of this Agreement to use in the manner and in subject to the restrictions hereinafter set forth, the Corporation's customer mailing lists file, commonly known as the "Nancy L. Halbert File" for the sale and solicitation of products created and established by Gary and which are not competitive with products then being marketed by the Corporation and/or any of its subsidiaries, including, specifically, heraldic products and other personalized products connected with Heraldy, surname reports and other genealogical products. Gary shall have the right to use the Nancy L. Halbert File list not more than six (6) times per year and he shall pay to the Corporation in advance its actual cost for the preparation of the list to be made available to Gary. All solicitations and uses of the mailing list by Gary shall be subject to the prior approval by the Corporation, and said approval shall not be unreasonably withheld, and Gary's use of said mailing list shall not in any way use the name *693 or word "Halbert's" and/or "Nancy L. Halbert" and/or any other name or names similar thereto, and Gary shall not engage in any joint venture or other similar arrangement in connection with the use of said mailing list. Gary shall not copy, rent, assign, retain or otherwise utilize said list or any part thereof in any manner, except as specifically provided for herein. The restriction on Gary's right to assign the use of said mailing list as aforesaid shall not prevent Gary from assigning the right to use said mailing list to a corporation which may hereafter be formed in which Gary and Nancy will be the controlling andprinciple [sic] shareholders, directors and officers. Provided, however, prior to such assignment, said assignee corporation shall first agree in writing to be bound by the terms of this Agreement, and such assignment shall not release, relieve or otherwise discharge Gary's liability hereunder and Gary shall be and remain liable for the assignee corporation's performance and observance of each, every and all of the terms of this Agreement. 8. Future Marketing Techniques. Gary may offer to the Corporation any new idea or other marketing technique conceived *694 or developed by him or brought to his attention for the sale and marketing of heraldic and other personalized products. The Corporation may study and examine each technique and idea suggested by Gary and at the time of such submission by Gary to the Corporation, such idea and technique shall be fully tested by Gary and a written report of the results of such tests shall be given to the Corporation. Upon receipt and after study of such submission, the Corporation, if it deems it advisable, shall fully further test such submission to further determine the results thereof and to determine to its satisfaction whether such technique increases the profitability of the solicitation or marketing techniques then or previously utilized by the Corporation for the sale and marketing of similar products and promotions. If the Corporation determines that such idea or technique does, in fact, increase profitability and if the Corporation desires to utilize such technique, then it shall pay to Gary one-half (1/2) of the excess profits received and earned by it directly as the result of the use of such technique or idea, such payments to be made periodically as the Corporation determines, but not *695 less often than annually. 9. Use of Name. Nancy does hereby confirm that the Corporation has the exclusive right to use her name, "Nancy L. Halbert" or "Nancy Halbert" for the sale and marketing of various consumer-oriented products, and Nancy shall and does hereby grant to the Corporation the continuing sole and exclusive perpetual right to use her name as aforesaid, and Nancy shall not use or permit her name to be used in any manner which would compete with the Corporation's use of said name or in any manner which would affect, interfere with or impair the Corporation's right to use her name as aforesaid. The Corporation, so long as it used the name "Nancy L. Halbert" or "Nancy Halbert" shall pay to Nancy the sum of One Hundred Dollars ($ 100.00) per month in full payment of said use. Nancy acknowledges that the right to the use of her name as aforesaid is unique and is specifically enforceable by the Corporation. 10. Covenant Not To Compete. For a period of six (6) years commencing from the date hereof, Garyand Nancy shall not, anywhere in the United States of America or Candada, compete directly or indirectly, individually or as a shareholder, officer, director, *696 partner, employee or in any other capacity whatsoever, with the Corporation in selling, marketing or otherwise distributing or dealing in any type of heraldic products or surname reports or other personalized products connected with Heraldy, surname reports and other genealogical products. Nancy and Gary shall at all times hereafter refrain from the use of the name "Halberts" in the conduct, directly or indirectly, of any consumer-oriented enterprise. Gary and Nancy shall at all times keep confidential any and all business information heretofore or hereafter received by them relating to the Corporation and/or its business and shall not disclose any of the same to any person, firm or corporation. Gary and Nancy acknowledge that the provision contained in this Paragraph protects the uniqueness of the Corporation's business and that a violation hereof will cause the Corporation irreparable damage, and, therefore, the Corporation shall have the right to obtain injunctive relief enforcing this provision without notice or bond. The transaction was closed with $ 150,000 being paid to Halbert and the Subordinated Debenture of Halbert's Inc., delivered to him. Concurrently with the closing *697 of the contract of sale, Halbert resigned as an officer and director of the corporation. Halbert was approximately 33 years of age when he sold his interest in the corporation. Both Halbert and the corporation were represented by their respective attorneys in negotiating, drafting and executing the October 8, 1971, contract for the sale of Halbert's stock. Specifically, both Halbert and the corporation had been advised of the tax consequences of an allocation of a portion of the consideration of the October 8, 1971, contract to a covenant not to compete with the corporation. The first draft of the October 8, 1971, contract or agreement, as prepared by the corporation's attorney, contained a broad covenant not to compete, which subsequently was made narrower at Halbert's request to limit such clause to the area of genealogical and heraldic products in surname research reports. Halbert was not aware, or made aware, during the negotiations that Halbert's, Inc., proposed to allocate on its books part of the $750,000 to the covenant not to compete. Halbert personally did not regard the covenant not to compete as an important part of the contract of October 8, 1971. In fact, *698 Halbertdid not intend to compete with the corporation, and Haslinger as president of Halbert's, Inc., knew that Halbert planned to go into book publishing. Halbert's understanding was that the purchase from him by the corporation was a straight stock sale, without any allocation to the covenant not to compete. He would not have signed the October 8, 1971, contract if in fact any part of the $ 750,000 purchase price for his stock had been allocated in the contract to the covenant not to compete. Neither the October 8, 1971, contract nor the note executed by the corporation to Halbert were contingent upon Halbert's performance in respect to the covenant not to compete in the October 8, 1971, contract. Halbert reported the $ 150,000 cash payment received in 1971 and the $ 100,000 in payment of principal, plus interest on the debenture, received in 1962 and 1973 in their entirety as gain from the sale of a capital asset, i.g., the stock in Halbert's, Inc. The corporation deducted annual amortization on a six-year basis for the sum of $ 309,000 as allocated by the corporation on its books and records to the covenant not to compete. OPINION The issue in this case is whether petitioner's *699 allocation of $ 309,000 [2] to a covenant not to compete contained in an agreement, which by its terms made no allocation thereto, should be sustained, with the result that petitioner is entitled to its claimed amortization deductions therefor, or whether the entire $ 750,000 should be treated as payment for the purchased stock in which event petitioner should be treated as having made a nondeductible capital expenditure. The issue is one of fact and the burden of proof is on the petitioner. . While there may be some question as to the level of proof required to discharge that burden, [3] we find it unnecessary to resolve whether the "strong proof" or ordinary burden of proof rule applies (see , since we hold that petitioners have *700 not carried either burden and that respondent should prevail. *701 We see no need to engage in a detailed discussion of the various legal principles which have been judicially developed over the years as guidelines for decisions in cases such as this. See, e.g., ; . We think the sufficient to set forth the various factual elements which have led us to the conclusion we have reached. We do think it appropriate, however, for us to note that the very transaction involved herein has already been considered by this Court. See , wherein we held that there should be no allocation to covenant not to compete. In so noting our prior decision, we hasten to acknowledge that it is not binding upon us in this case where we have a different record upon which our conclusion must rest, [4] although we are constrained to note that much of the cogent reasoning in , is applicable herein. *702 The main thrust of petitioner's argument is that the fair market value of Halbert's stock was $ 4,500 per share (or an aggregate of $ 441,000) established by agreement of the shareholders of the corporation on June 21, 1971, and that the excess of the purchase price over that value ($ 309,000) can and should be determined to be the value of the covenant not to compte. Assuming arguendo that the $ 441,000 value should be accepted as the fair market value on the date it was agreed to, it does not necessarily follow that such value should be accepted as the true worth of Halbert's shares as of October 8, 1971, the date his shares were purchased by the corporation. There was a lapse of almost four months between the two dates and the evidence indicates that the business of the corporation was growing rapidly. Indeed, Haslinger testified that the profits of the corporation historically came during the winter months so that it is not unlikely that this factor was take into consideration in determining the purchase price. In addition, Haslinger testified that the formula for fixing the value of the shares for purposes of the shareholders' agreement was twice pretax earnings, and, although *703 he used the word "forecasted," we are not satisfied that the formula adequately accounted for the anticipated growth of the corporation. [5]
Moreover, it seems clear to us that the parties did not intend to allocate any amount to the covenant. The stock purchase agreement between Halbert and the corporation contained no allocation and the parties have stipulated that both were advised of the tax consequences of an allocation. The fact is that there were negotiations about the scope of the covenant and these negotiations could easily have included the question of allocation if the parties has intended an allocation to be made. The absence of any negotiations on allocation takes on added significance when on takes into account that there was a specific provision in the agreement for a separate payment to Nancy Halbert for the use of her name. The history of the various agreements and negotiations between Haslinger and Halbert in connection with the original shareholders' agreement and between Halbert and Miller gives no indication that a covenant not to compete, in the event of *704 separation of one of the parties from the corporation, was ever considered -- a further indication that the parties did not consider that such a covenant was a significant element. [6] Moreover, Halbert had other plans, which did not involve competing with the corporation, and we think it a reasonable inference that Haslinger and Miller were both aware of his plans in this regard. Furthermore, we are satisfied that the nature of the corporation's business was such that no customer loyalty was involved and that the opportunity to compete was generally available to anyone who wished to do so, thereby minimizing any expertise that Halbert might have acquired, particularly when one takes into account that the corporation already had a two-year head start in the genealogy and heraldry business. In short, we have serious doubts that the covenant not to compete involved herein had any economic reality. There are also indications in the agreement that other elements thereof could well have been consideration *705 for the covenant not to compete. Specifically Halbert was given the right to use the "Nancy L. Halbert File" for certain purposes. He was also given the opportunity to offer new ideas or other marketing techniques to the corporation, although admittedly the legally binding obligation imposed upon the corporation in this respect is far from clear. But the undertaking of the corporation to make two of its employees available for consultation with Halbert to review and develop its marketing techniques and concepts implies that the parties considered that the aforementioned opportunity had substance. We recognize that there is some indication in the record that the corporation took steps to attempt to hold Halbert to the covenant not to compete, but such efforts merely show that the corporation considered that it had an enforceable obligation. It is not determinative of the issue as to whether an allocation of a part of the consideration paid to Halbert should be made to the covenant. Similar reasoning disposes of petitioners' contention that merely because Halbert was willing to be bound by the covenant, it follows that it had economic realty and therefore a value should be assigned *706 to it. Similarly, we think that the indications in the record that the bank, which provided the financing for the initial $ 150,000 payment, required a covenant not to compete should be accorded little, if any, weight. Not only was the testimony in this regard uncorroborated, but it seems to us that any concern of the bank would merely go to the need for an enforceable covenant and have no significant relevance to the question of whether a portion of the purchase price should be allocated thereto. The long and the short of this case is that both in terms of "intent" and "economic reality" (see petitioners have failed to carry their burden. ;; ; Delsea Drive-In , affg. a Memorandum Opinion of this Court. See also . *707 The cases relied upon by petitioners are all distinguishable on their facts. [7]
Decision will be entered for the respondent. Footnotes
1. The consolidated return for the taxable year ended June 30, 1972, showed a taxable income for Halbert's Inc., of $ 1,213,344.↩
2. This figure was arrived at by valuing the stock in accordance with the shareholders' valuation of$ 4,500 per share for 98 shares (or $ 441,000) and allocating the balance of the $ 750,000 purchase price to the covenant.↩
3. The decided cases are unclear as to the proper standard of proof in cases such as this, where is an express covenant not to compete but no allocation has been made to it in the agreement between the parties; the applicable test sometimes turns on whether the issue is the intent of the parties or the "economic reality" of the covenant (see discussion of the two-pronged rationale utilized by the courts in or whether it is petitioner or respondent who is attacking the lack of allocation in the agreement. Compare ; ; ; ; ; . The respondent herein does not seek to apply the rule of , which has not been accepted by this Court. See , on appeal (5th Cir., Oct. 3, 1979).↩
4. Compare , with . See also .↩
5. See note 1 supra↩. See also .
6. We also note that the record indicates that when Miller severed his relationship in 1975, there not only was a covenant not to compete but there was a specific allocation thereto.↩
7. ; ; ; ; , affd. ; ; . We note that in , the court refused to make an allocation, and that ,↩ did not involve a covenant not to compete.